# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DISTRICT

| | | |
|---|---|---|
| FIRST HEALTH GROUP CORP.<br>15400 Calhoun Drive, Suite 300<br>Rockville, MD 20855, | ) ) ) ) | Case No. 1:22-cv-02090<br><br>Judge _____ |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| MEDICAL MUTUAL OF OHIO<br>2060 East Ninth Street<br>Cleveland, OH 44115, | ) ) ) ) | **COMPLAINT**<br><br>**JURY DEMAND ENDORSED HEREON** |
| Defendant. | ) | |

Plaintiff First Health Group Corp. states as follows for its Complaint against Defendant Medical Mutual of Ohio:

**PARTIES, JURISDICTION, AND VENUE**

1. First Health Group Corp. ("First Health") is a Delaware corporation with its principal place of business in Rockville, Maryland.

2. First Health provides national Preferred Provider Organization ("PPO") network access to health plan-customers (e.g., insurance companies, self-insured employer groups) all across the United States. A PPO is a type of health plan that contracts with medical providers to create a network of participating providers who have agreed to provide health care services to health-plan members at pre-negotiated discounted rates. First Health operates one of the largest PPO networks in the country. Many health plans contract for access to First Health's PPO network to supplement an existing network of providers that they offer through their own self-administered

network of providers. First Health also provides other programs to help its clients manage costs for their health plans.

3. Medical Mutual of Ohio ("MMO") is a mutual insurance company organized under Ohio law with its principal place of business in Cleveland, Ohio.

4. MMO sells individual and group health insurance, Medicare supplemental insurance, and other ancillary products.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, and is between citizens of different states.

6. This Court has personal jurisdiction over MMO because it is incorporated and has its principal place of business in Ohio.

7. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to First Health's claims occurred in this District.

## FACTUAL ALLEGATIONS

*a. The Medical Cost Management Services Agreement*

8. On or about May 1, 1997, HealthCare Compare Corp. ("HCCC") entered into a Medical Cost Management Services Agreement ("the Agreement") with MMO. A true copy of the Agreement is attached hereto as Exhibit 1. HCCC is the predecessor name to the entity currently known as First Health, and the parties acknowledged in an amendment entered into on December 1, 1998 that references to HCCC in the Agreement would be deleted and replaced with references to First Health.

9. The parties entered into the First Amendment to the Agreement on December 1, 1998. A true copy of the First Amendment is attached hereto as Exhibit 2.

10. The parties entered into the Second Amendment to the Agreement on May 1, 2000. A true copy of the Second Amendment is attached hereto as Exhibit 3.

11. The parties entered into the Third Amendment to the Agreement on June 14, 2001. A true copy of the Third Amendment is attached hereto as Exhibit 4.

12. The parties entered into the Fourth Amendment to the Agreement on May 1, 2003. A true copy of the Fourth Amendment is attached hereto as Exhibit 5.

13. The parties entered into the Fifth Amendment to the Agreement on January 1, 2007. A true copy of the Fifth Amendment is attached hereto as Exhibit 6.

14. The parties entered into the Sixth Amendment to the Agreement on January 1, 2008. A true copy of the Sixth Amendment is attached hereto as Exhibit 7.

15. The parties entered into the Seventh Amendment to the Agreement on May 1, 2009. A true copy of the Seventh Amendment is attached hereto as Exhibit 8.

16. The parties entered into the Eighth Amendment to the Agreement on May 1, 2010. A true copy of the Eighth Amendment is attached hereto as Exhibit 9.

17. The parties entered into the Ninth Amendment to the Agreement on May 1, 2013. A true copy of the Ninth Amendment is attached hereto as Exhibit 10.

18. The parties entered into the Tenth Amendment to the Agreement on May 1, 2015. A true copy of the Tenth Amendment is attached hereto as Exhibit 11.

19. Pursuant to § 3.1 of the Agreement, First Health agreed to provide Medical Cost Management Services to MMO, including access to First Health's medical PPO networks and medical review services.

20. Section 5.1 of the Agreement provides that MMO will pay First Health for all Medical Cost Management Services provided pursuant to the Agreement. As relevant here, MMO guaranteed in Section 5.1 to pay First Health annual fees not to fall below $1,000,000, promising

that "[n]otwithstanding anything to the contrary in this Agreement, including any Supplements or Appendices, in no event will the amount of [First Health]'s fees paid by [MMO] in any agreement year be less than one million dollars ($1,000,000)." This $1,000,000 annual minimum guarantee has never been removed from the Agreement or modified by an amendment.

21. The Agreement's duration is addressed by Section 6.1. Originally, the Agreement was to last for three years (May 1, 1997 through April 30, 2000) and would thereafter renew automatically for consecutive one-year terms until terminated. In the most recent amendment to Section 6.1 (the Seventh Amendment signed in 2009), the parties agreed: "The Term of this Agreement is for one (1) year beginning May 1, 2009 and ending April 30, 2010 (each year, an 'Agreement Year') and will automatically renew for consecutive one (1) year terms (each a 'Term') thereafter, unless terminated as hereinafter set forth." Since that Seventh Amendment, each successive year—i.e., from May 1 of one calendar year to April 30 of the next calendar year—has been considered a separate Agreement Year. Section 6.1 of the Agreement has not been amended since 2009.

22. The Agreement, as originally signed in 1997, contained two fee schedules. "*Appendix I Local Schedule of Fees*" applied to Local Sub-Clients (as defined in Section 11.13.1); "*Appendix I National Schedule of Fees*" applied to National Sub-Clients (as defined in Section 11.13.2). To clarify that fees paid under both schedules combined, as opposed to only under one or under the other, would be used to determine whether MMO had achieved the $1,0000,000 annual minimum guarantee, the fee schedule for Appendix I Local Schedule of Fees said:

> D. Application of Annual Minimum
>
> The fees set forth above, combined with the fees set forth in Appendix I-National, are subject to the annual minimum set forth in 5.1 of the Agreement.

4

And the fee schedule from the Appendix I National Schedule of fees similarly said:

> D. Application of Annual Minimum
>
> The fees set forth above, combined with the fees set forth in Appendix I-Local, are subject to the annual minimum set forth in 5.1 of the Agreement.

23. In the Second Amendment, executed in 2000, the local and national fee schedules were consolidated into "Appendix I Schedule of Fees for Local/National/Named Accounts," and a new fee schedule was added to relate to the Ohio Retirement System, which was titled "Appendix I-A Schedule of Fees for Ohio Retirement System." Language in Section C of both Appendix I and Appendix I-A again clarified that the annual minimum guarantee applied to the combined fees rather than separately to each fee schedule.

24. Due to a scrivener's error, however, this clarifying language was transposed between the two fee schedules. Specifically, the language that should have appeared in Section C of Appendix I was erroneously included in Section C of Appendix I-A, and the language that should have appeared in Section C of Appendix I-A was erroneously included in Section C of Appendix I. As a result, from the date of the Second Amendment until the issue was mooted by a restructuring of the fee schedules in the Tenth Amendment, "Appendix I Schedule of Fees for Local/National/Named Accounts" and "Appendix I-A Schedule of Fees for Ohio Retirement System," respectively, included the following language:

> C. APPLICATION OF THE ANNUAL MINIMUM
>
> The fees set forth above, combined with the fees set forth in Appendix I-Schedule of Fees for Local/National/Named Accounts, are subject to the annual minimum set forth in Section 5.1 of the Agreement.
>
> \* \* \*
>
> C. APPLICIATION OF THE ANNUAL MINIMUM
>
> The fees set forth above, combined with the fees set forth in Appendix I-A – Schedule of Fees for Ohio Retirement System, are subject to the annual minimum set forth in Section 5.1 of the Agreement.

25. In the Tenth Amendment, executed in 2015, the erroneously transposed language was removed from Appendix I entirely. The parties removed the language because there were no longer two fee schedules to the Agreement, so language regarding the combination of fees under two schedules was no longer applicable. The removal had nothing to do with whether the minimum annual guarantee remained applicable: it was the parties' intent that the minimum annual guarantee would remain applicable, as their course of conduct in the years following the Tenth Amendment confirms.

26. Section 10.5 of the Agreement provides that it "will be governed by and constructed in accordance with the laws of the State of Illinois without regard to principles of conflict of law."

### b. *MMO Breaches the Agreement and First Health Sends Demand Letters*

27. In or around June 2018, MMO entered into a business arrangement with AXA Assistance USA, Inc. whereby MMO's members started accessing a provider network operated by Aetna Life Insurance Company. After doing so, MMO's utilization of First Health's PPO network dropped precipitously; since entering the other arrangement, it has paid total annual fees that are less than the annual $1,000,000 minimum guarantee.

28. During the Agreement Year ending April 30, 2020, MMO paid less than $700,000 in fees to First Health, well below the $1,000,000 it guaranteed it would pay that year.

29. Because MMO failed to comply with the requirement in § 5.1 of the Agreement that it pay a minimum of $1,000,000 to First Health for the Agreement Year ending April 30, 2020, First Health sent a demand letter to MMO on or about August 4, 2020 requesting that MMO comply with § 5.1 and pay the balance due to First Health for the Agreement Year ending April 30, 2020.

6
21532918v1

30. On or about August 26, 2020, MMO responded that it would not make any additional payment to First Health as requested in First Health's August 4, 2020 letter. Thereafter MMO did not cure its default.

31. During the Agreement Year ending April 30, 2021, MMO paid less than $200,000 in fees to First Health, well below the $1,000,000 it guaranteed it would pay that year.

32. On or about March 8, 2022, First Health sent another demand letter to MMO. In the letter, First Health reiterated its outstanding demand that MMO remit payment for the balance due to First Health for the Agreement Year ending April 30, 2020. First Health also demanded that MMO comply with § 5.1 and pay the balance due to First Health for the Agreement Year ending April 30, 2021.

33. On or about April 20, 2022, MMO responded that it would not make any additional payment to First Health as requested in First Health's March 8, 2022 letter. Thereafter MMO did not cure its default.

34. During the Agreement Years ending April 30, 2020 and April 30, 2021, First Health at all times performed its obligations under the Agreement.

35. First Health never waived (let alone expressly waived in writing, as required by Section 10.13 of the Agreement for a valid waiver of compliance with any term or condition of the Agreement) its position that the Agreement contained a minimum fee requirement or its entitlement to be paid by MMO a minimum of $1,000,000 in fees each Agreement Year.

36. To date, MMO still has not satisfied its obligation under the Agreement to pay First Health a minimum of $1,000,000 for each of the two Agreement Years ending April 30, 2020 and April 30, 2021.

37. Section 5.4 of the Agreement provides that "[p]ayments due [First Health] which are more than fifteen (15) days in arrears shall bear interest at the rate of one and one-half percent

(1 ½%) per month. In addition to interest, [MMO] agrees to pay all expenses, costs, and charges relating to the collection, including attorneys' fees incurred, whether or not suit is filed for payment."

38. Recognizing it had not met its annual $1,000,000 minimum commitment to First Health since entering its other business arrangement and having no intention of meeting that commitment in the future, MMO, by notice letter dated December 28, 2020, provided notice to terminate the Agreement effective April 30, 2021.

## COUNT I

### Breach of Contract

39. First Health incorporates by reference the allegations contained in paragraphs 1 through 38 of this Complaint as if fully rewritten here.

40. The Agreement is a valid and enforceable contract under which MMO agreed to pay First Health a minimum of $1,000,000 in fees per Agreement Year in exchange for Medical Cost Management Services.

41. First Health fully performed its obligations under the Agreement.

42. MMO materially breached the Agreement by failing to pay First Health a minimum of $1,000,000 in fees in each of the Agreement Years ending April 30, 2020 and April 30, 2021.

43. Each of MMO's material breaches caused First Health substantial monetary damages in an amount to be proven at trial, but which in any event exceed $75,000.

44. First Health demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, First Health prays this Court for the following relief:

a) Damages in an amount to be determined at trial, but in any event at least $75,000;

b) Pre- and post-judgment interest;

c) Reasonable costs and attorneys' fees that First Health incurs in the prosecution of its claims; and

d) Such other or further relief that this Court deems just and proper.

Dated: November 18, 2022

BY: /s/ Jill G. Okun
JILL G. OKUN (No. 0034477)
PORTER WRIGHT MORRIS & ARTHUR LLP
950 Main Avenue, Suite 500
Cleveland, OH 44113
Phone: 216-443-2508
Fax: 216-443-9011
Email: JOkun@porterwright.com


J. ANDREW KEYES (*pro hac vice* to be filed)
GRANT A. GEYERMAN (*pro hac vice* to be filed)
ELEANOR J.G. WASSERMAN (*pro hac vice* to be filed)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, DC 20024
Phone: 202-434-5000
Email: akeyes@wc.com
ggeyerman@wc.com
ewasserman@wc.com

Attorneys for First Health Group Corp.